## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

Scott Xavier Brown,
individually and on behalf
of all others similarly situated,                                    No.

      Plaintiff,

v.                                                                **JURY TRIAL DEMANDED**

VOLKSWAGEN GROUP OF AMERICA, INC.,
VOLKSWAGEN MANUFACTURING
CORPORATION OF AMERICA, and,
SUBURBAN IMPORTS OF FARMINGTON HILLS, INC., d/b/a
SUBURBAN VOLKSWAGEN OF FARMINGTON HILLS


      DEFENDANT.
_____/
## CLASS ACTION COMPLAINT

      Plaintiff Scott Xavier Brown, files this action on behalf of himself and

on behalf of all other persons similarly situated who leased or bought a

Volkswagen "clean diesel" Defective car sold by Volkswagen Group of

America for Michigan Consumer Protection Act claims, as well as federal

law violations, and in support states the following:

### NATURE OF THE CLAIM

1. In order to compete with the Toyota Prius, and other hybrid and

    emerging environmentally focused automobiles offered for sale,

    Volkswagen advertised small diesel engine cars as "clean diesel," to

1

fool eco-friendly consumers into believing the "clean diesel" cars were superior to other diesel and gasoline vehicles, both in the way they performed regarding acceleration and handling, as well as touting high fuel mileage claims.

2. In response to news emerging in the public domain regarding the "defeat" device scandal, Volkswagen US Chief Michael Horn stated, "Let's be clear about this: Our company was dishonest with the EPA and the California Air Resources Board and with all of you. In my German words, we have totally screwed up." "The Tech Behind how Volkswagen Tricked Emissions Tests," by Andrea Peterson and Brian Fung, Washington Post,

https://www.washingtonpost.com/news/the-switch/wp/2015/09/22/the-tech-behind-how-volkswagen-tricked-emissions-tests/ accessed September 23, 2015.

3. Volkswagen further admitted the "clean diesel" cars were employing a software program or "defeat" which was capable of tricking emissions testing devices to the fact that Volkswagen's "clean diesel" cars were releasing asthma-aggravating and otherwise environmentally harmful nitrous oxide.

4. The "defeat" devices would reduce the performance, torque, and

acceleration of the car when activated in order to reduce the hydrocarbon and other noxious exhaust emission to comply with EPA and state requirements. Engineers designing diesel engine vehicles must strike a balance between operating parameters that include heat (which affects engine longevity), environmental restrictions, horsepower, torque, fuel consumed, and noise generated. Frequently these operating parameters are juxtaposed in an inverse relationship to each other (environmental restrictions vs. fuel mileage) where one is sacrificed at the expense of the other. Volkswagen represented to consumers that it had achieved the superior product that delivered high fuel mileage while meeting emissions requirements. Unfortunately, consumers just this week were told by the EPA that Volkswagen's claims were deceptive and the result of the "defeat" device. As a result, the Volkswagen "clean diesel" vehicles will either require additional expensive modifications, or, sacrifice one or more of the above identified operating parameters; e.g. operate at higher temperatures and thus reducing longevity, and/or delivering reduced torque and horsepower.

5. As the lovable older-lady exclaims in Volkswagen's 2015 ad campaign "Diesel used to be dirty, but this is 2015. At the end of the

ad the same seraphic woman, while holding a white towel she held behind the apparently running car's tailpipe proclaims, "See how clean it is."



https://youtu.be/YPkD-GvUMc8, accessed September 23, 2015.

6. Unfortunately, Volkswagen's fraudulent and deceptive practices concealed that the approximately 500,000 vehicles sold in the US spew as much as 20 to 40 times the amount of permitted pollution into the air.

7. Similarly situated to the approximately 500,000, other purchasers/lessors, Plaintiff Scott Brown purchased a 2011 Volkswagen Jetta TDi, Vin Number 3VWLL7AJ0BM088081 because it offered advertised better performance and fuel economy than the competition. As this suit explains, he was deceived by VW.

4

## JURISDICTION AND VENUE

8.  Jurisdiction is proper in this Court pursuant to the Class Action
    Fairness Act, 28 U.S.C. § 1332(d), because a member of the Plaintiff
    Class is a citizen of states different from Defendants' home states, and
    the aggregate amount in controversy exceeds $5,000,000, exclusive of
    interest and costs.

9.  The Court has personal jurisdiction over all Defendants because they
    are authorized to do business and in fact do business in the Eastern
    District of Michigan. The Defendants have sufficient minimum
    contacts with this District; and each Defendant otherwise intentionally
    avails itself of the markets in this State through the promotion,
    marketing and sale of the Defective Vehicles thus rendering the
    exercise of jurisdiction by this Court permissible under Florida law
    and the U.S. Constitution.

10. The Court also has personal jurisdiction over Volkswagen under 18
    U.S.C. § 1965 because they are found or have agents or transact
    business in this District.

11. Venue is proper in the Eastern District of Michigan pursuant to 28
    U.S.C. § 1391(a) because a substantial part of the events or omissions
    giving rise to the claims at issue in this Complaint arose in this

5

District, a substantial part of the property that is the subject of this action is situated in this District, Class members residing in this district have been harmed as a result of Defendants' acts or omissions, and Defendants are subject to the Court's personal jurisdiction with respect to this action.

12. Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiff also asserts claims for actual and exemplary damages pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages and secure other relief against Defendants for violation of those state laws. Plaintiff and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

13. Further, this Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337. This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or

controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from some Defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

14. Venue is proper in this district pursuant to Section 12 of the Clayton Act (15

U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

15. This Court has in personam jurisdiction over the Defendants because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, inter alia: (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of vehicles with the "defeat" device throughout the United States, including in this district;

(c) had substantial aggregate contacts with the United States as a whole, including in this district; or (d) were engaged in an illegal EPA regulations avoidance conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district. Defendants also conduct business throughout the United States, including in this district, and they have purposefully availed themselves of the laws of the United States.

16. Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States.

17. The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

18. Portions of the Volkswagen vehicles equipped with "defeat" devices are assembled at the Chattanooga Tennessee Volkswagen plant, and also are manufactured abroad by Defendants and sold for use in

8

automobiles that were either manufactured in the United States or manufactured abroad and sold in the United States are goods brought into the United States for sale, and therefore constitute import commerce. To the extent any portions of the vehicles equipped with "defeat" devices are purchased in the United States, and such "defeat" device systems do not constitute import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

19. By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes. Defendants, directly and through their agents, engaged in activities affecting all states, to "defeat" EPA mandated testing and unfairly compete with other auto makers that did not employ "defeat" devices and reported lower efficiency mileage and horsepower. The "defeat" device conspiracy unreasonably restrained trade and adversely affected the market for

9

diesel vehicles.

20. Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased vehicles with "defeat" devices for personal use, including Plaintiffs and members of the Classes.

## THE PARTIES

21. Plaintiff Scott Brown resides in the Eastern District of Michigan, and is a resident of the State of Michigan. Plaintiff purchased a 2011 Volkswagen Jetta TDi with a "clean diesel" engine.

22. Plaintiff did not know at the time he purchased the VW that the vehicle contained a "defeat" device that changed the software programming which controlled the car's operation in a way that harmed the environment by emitting up to 40 times the allotted pollution metrics. Mr. Brown would not have purchased the same VW but for the advertised mileage and "clean diesel" advertisement claims displayed in print, on television, and displayed at the dealership. Similarly, Mr. Brown would not have paid the additional $3000 or more dollars the added "clean diesel" engine increased the purchase price over a gasoline powered model. Further, Mr. Brown has suffered damages in the loss of resale value of the car as well.

23. Volkswagen Group of America is a foreign for-profit corporation. It is incorporated and organized under the Laws of the State of New Jersey.

24. Volkswagen Manufacturing Corporation of America is a foreign for Profit Corporation, organized under the Laws of the State of New Jersey. It makes and distributes VW vehicles destined for interstate commerce and Michigan consumers. Both Volkswagen Defendants are referred collectively as "VW" in this complaint.

25. Suburban Imports of Farmington Hills, Inc., d/b/a, Suburban Volkswagen of Farmington Hills, is a Michigan corporation, and operated the dealership that sold the "defeat" device equipped vehicle to Plaintiff.

**AGENTS and CO-CONSPIRATORS RELATED TO SHERMAN ACT**

26. Each Defendant acted as the principal of or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged.

27. Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have

11

participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

28. Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

29. Suburban Imports of Farmington Hills, Inc., knew or should have known the "clean diesel" vehicles it was offering contained a "defeat" device.

## FACTUAL ALLEGATIONS

### A. "Clean Diesel" Advertisements are Deceptive

30. Traditionally, diesel vehicles are known as slower than gasoline powered vehicles, more closely related to larger diesel semi trucks which spew black soot into the air and are noisy, smelly and slow. Related to selling cars in the 2009 model year, Volkswagen advertised

"clean diesel" vehicles as improving upon diesel's poor reputation, and having superior performance and fuel economy, as well as being ecologically efficient and "clean." Volkswagen advertised "direct injection" engines, badged as TDI ("turbocharged direct injection") as meeting these environmental goals without sacrificing performance.

**B. Defendants Charged Increased Prices for "Clean diesel"**

31. Depending upon the model, Defendants charged increased prices for the "clean diesel" models above and beyond what Defendants charged for gasoline models. The lowest price "clean diesel" upgrades cost $1,000 for the Golf, but as much as $6,855, for the Passat. Plaintiff paid approximately $2,000.00, for the "clean diesel" upgrade in his Volkswagen Jetta.

**C. VW Foiled Federally Mandated Automobile Emissions Testing**

32. Congress enacted the Clean Air Act, which went into effect in 1963 as identified in its long title to "improve, strengthen, and accelerate programs for the prevention and abatement of air pollution."

33. Cars sold nationally, as tested by individual automotive companies, must comply with emission thresholds as determined by the Environmental Protection Agency. Before a car can be sold in the US, the manufacturer must certify the vehicle achieves satisfactory test

13

results related to emissions standards. The standards are set forth in the act, and represent Congress' hope that as automotive technologies develop, manufacturers will direct efforts to improving reduction in emissions. The Act further provides for stiff per-vehicle penalties if a manufacturer sells vehicles that fail to comply.

34. Volkswagen also advertised in television, print, and electronic media, a technology called TDI – short for turbocharged direct injection, which claimed to provide, reduced emissions and reduced fuel consumption.

35. A West Virginia University professor, Daniel Carder, as early as 2014, released findings related to significant "on road" testing of Volkswagen vehicles. Professor Carder found that the VW vehicles acted differently while being tested with traditional testing equipment as opposed to while being driven in real-life driving situations. In the real-life driving tests the vehicles emitted significantly elevated levels of nitrous oxide.

36. Competing auto manufacturers are able to achieve emissions levels that meet or exceed EPA requirements by using urea injection systems. The EPA requires a car that runs out of urea injection fluid to "limp" home, limiting their speed and flashing warning lights. This

urea system adds additional cost to the vehicle, and requires the consumer to monitor the fluid level closely.

37. Rather than install a urea system, Volkswagen used a "defeat" device, essentially a computer program that sensed when the car was being subject to emission testing. The "defeat" device reduced the fuel mileage, horsepower and torque of the vehicle while under testing conditions. The software was able to do this because the EPA testing conditions are known to industry insiders and are controlled, using predictable testing equipment that for example, spins only the front wheels while locking the rear wheels in place, require turning off traction control, and, do not involve any steering wheel input as the testing equipment requires the wheels point straight forward. Using one or more of these types of triggers, the "defeat" device robs the vehicle of performance in the name of passing the emissions test. As a result, the vehicle while under the "defeat" is inferior in regards to performance and fuel economy to advertised claims.

38. Fixing the Plaintiffs' vehicles will result in reduced performance and fuel economy, as well as require costly upgrades. The resale value of the cars, even after the repairs, will be reduced and Plaintiffs will suffer damages in the form of additional delay and difficulty in trying

15

to resell vehicles in order to satisfy future consumers concerns about Volkswagen's deceptive practices.

**D. Defendants Engaged in their own Testing and Realized Without a "Defeat" Device enabled, the Marketplace would Know VW Diesel was an Inferior Product**

39. The testing relied upon by the EPA to certify VW "clean diesel" cars as compliant with the Clean Air Act is largely conducted internally by Volkswagen and its related entities. The certifications of the absence of "defeat" devices made by Volkswagen to the EPA were critical in the EPA certifying the vehicles for sale for use on public roads.

40. Other entities, including European testing agencies, worked with Defendants to falsely certify the "clean diesel" cars were emitting levels of nitrous oxide that complied with the United States Clean Air Act.

41. Sales of competitor automobiles, both hybrid gasoline/electric, and other diesel cars, were adversely affected by Defendants' claims related to fuel efficiency and longevity.

42. The class members who own a "defeat" device equipped vehicle chose those vehicles over the competition as a result of the now defunct testing performed related to emissions. As a result of the EPA

16

"Notice of Violation," the marketplace is now aware the Defendants

sold an inferior product.

43. The purchasers of "defeat" device equipped vehicles paid supra-

competitive prices for the vehicles based upon the claims made by

Defendants.

44. By reason of the alleged violations of the antitrust laws, Plaintiffs and

the members of the Classes have sustained injury to their businesses

or property, having paid higher prices for "defeat" device equipped

vehicles than they would have paid in the absence of Defendants'

illegal contract, combination, or conspiracy, and, as a result, have

suffered damages in an amount presently undetermined. This is an

antitrust injury of the type that the antitrust laws were meant to punish

and prevent.

**E. The EPA Issued a "Notice of Violation" on September 18, 2015**

45. The EPA issued a "Notice of Violation" letter, accessible at

http://www3.epa.gov/otaq/cert/documents/vw-nov-caa-09-18-15.pdf

which details and discusses the "defeat" device. The letter explains

the purpose of the EPA emmissions requirements in relation to the

reduction of nitrous oxide (NOx) and related pollutants as volitole

compounds that produce smog and affect "human health and the

17

environment."

46. The EPA Notice of Violation explains that Volkswagen installed its "defeat device" in at least the following diesel models of its vehicles:

    a.  2009-2015 VW Jetta;

    b.  2009-2015 VW Beetle;

    c.  2009-2015 VW Golf;

    d.  2014-2015 VW Passat; and,

    e.  2009-2015 Audi A3.

## STATUE OF LIMITATIONS

**Late Discovery of "Defeat" Device Was Result of Defendants' Fraudulent Concealment and Defendants Should be Estopped from Claiming Entitlement to a Statute of Limitations Defense**

47. Plaintiffs and the members of the Classes are consumers who purchased "defeat" device equipped vehicles had no direct contact with the testing used to determine the vehicles were Clean Air Act complaint and no other means from which they could have discovered the combination and conspiracy described in this Complaint before the September 18, 2015, Notice of Violation issued by the EPA. No information in the public domain was available to the Plaintiffs and the members of the Classes prior to the EPA's Notice of Violation.

48. Volkswagen installed the "defeat" device in the form of an algorithm or software program in its "clean diesel" vehicles. The "defeat" device was required to pass 2008 emission testing, and was concealed from Plaintiff and similarly situated Class Members. Plaintiff only came to know of the "defeat" device after the EPA "Notice of Violation" and subsequent news coverage. As a result Defendants' steps to conceal the "defeat" device have tolled a statute of limitations that may apply.

## CLASS ACTION ALLEGATIONS

49. Plaintiff brings this lawsuit as a class action on his own behalf and on behalf of all other persons similarly situated as members of the proposed Class, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

50. The Classes' claims all derive directly from a single course of conduct by Defendants related to their advertisement and marketing of "clean diesel" vehicles. Defendants sold vehicles with 2009-2015 model years that contained the same "clean diesel" engine. Individual class members with "clean diesel" engines are harmed similarly, and the law that applies to each is the same or similar across states.

51. Rule 23 of the Federal Rules of Civil Procedure permits this Court to effectively administer a Class action and/or certify multi-jurisdictional claims or divide Plaintiffs into sub-classes.

52. Plaintiff would define the class as:

> All persons or companies that leased or purchased a "clean diesel" Volkswagen, model years 2009-2015, in the United States. A sub-class would be defined as persons in the State of Michigan that leased or purchased a "clean diesel" Volkswagen, model years 2009-2015.

53. Although a sub-class could include Plaintiffs who are asthmatic or otherwise were personally injured by Defendants' actions, those persons would be excluded from Plaintiff's identified class in this action.

54. Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased vehicles with "defeat" devices directly or for resale. Also excluded would be persons who have an ownership interest in Defendant or related entities.

**Numerosity and Ascertainability**

55. Because Volkswagen advertised and admits there were approximately

20

500,000 "clean diesel" vehicles sold in the United States, this action meets the requirements of Fed. R. Civ. P. 23(a)(1). These vehicles were sold at Volkswagen dealers across the United States, rendering joinder of individuals impracticable. Joining all Plaintiffs into one action will save Defendants' and the Court, as well as Plaintiffs, significant resources.

56. Michigan Secretary of State, as well as other state motor vehicle records, and Defendants' sale records can be used to ascertain the names and addresses of class members.

**Typicality**

57. Plaintiff's claims are typical of the claims of the Class members, as they all involve damages related to the sale by Plaintiffs of "clean diesel" vehicles equipped with "defeat" devices. The damages incurred are similar to Plaintiffs, and the relief sought by Plaintiff is typical of relief that should be awarded to other members of the class as well as those absent from the class.

**Adequacy of Representation**

58. Plaintiff will fairly and adequately represent and protect the interests of the Classes.

59. Plaintiff and his attorney have the resources to prosecute this action

on behalf of the Class, and neither Plaintiff nor counsel have any ownership in Defendant or other adverse interest to the class.

**Predominance of Common Issues**

60. There are numerous questions of law and fact common to Plaintiff and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include the following:

    a. Did the "Clean diesel" vehicles contain "defeat" devices?

    b. Did the "defeat" devices cause additional emissions of nitrous oxide and other related hydrocarbons?

    c. Did the "Clean diesel" vehicles have diminished resale value?

    d. Did the Defendants engage in unlawful, unfair or deceptive business practices, in marketing "clean diesel" vehicles?

    e. Did the Defendants sell goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another?

    f. Did the Defendants Disparage the goods, services, business, or reputation of another by false or misleading representation of fact?

g.  Did the members of the Class that includes buyers/lessees of "clean diesel" suffer damages?

h.  Are the damages suffered by Plaintiff and members of the class remediable by installing a urea system or other means?

i.  How are the damages suffered by Plaintiffs and members of the class related to loss of resale value to be determined?

j.  Does Defendants' course of conduct related to "defeat" devices merit punitive damages?

k.  Whether the alleged conspiracy violated the Sherman Act, as alleged in the Claim for Relief?

l.  Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law, as alleged in the Claims for Relief?

a.  Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Claim for Relief?

**Superiority**

61. Plaintiff and Class Members have all suffered and will continue to

23

suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by the individual Class Members on the claims asserted herein would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for Defendants.

62. Absent a class action, most Class Members would likely find the cost of suing on individual claims too expensive. This effectively leaves those individuals stripped of any remedy. The judicial system would slow to a crawl if forced to deal with individual suits, and as a result, under Fed. R. Civ. P. 23(b)(3)(A), class action is the superior form of litigation.

63. Discovery is applicable to all members of the class as the same transaction occurred and the same course of conduct alleged to have been perpetuated by the Defendants affected all purported Plaintiffs in a similar, and even formulaic fashion, rendering class treatment appropriate and efficient.

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act

64. Plaintiff incorporates by reference the allegations in the preceding

paragraphs. Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

65. The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

66. At least as early as 2008, and likely even earlier, when testing "clean diesel" vehicles to be released for sale as Model Year 2009, and continuing until Volkswagen removed "clean diesel" cars for sale on showroom floors sometime during the week this complaint was filed, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially reduce the performance of the "clean diesel" vehicles, either by reducing horsepower, operating at higher average engine block temperatures, increasing fuel mileage consumption, and otherwise changing the fuel mapping, spark timing, valve timing, and other operating parameters of the "clean

diesel" cars to "defeat" the EPA testing requirements.

67. This "defeat" device has the effect of fixing, raising, stabilize, and controlling prices for diesel and vehicles marked as ecologically friendly or "clean" thereby creating anticompetitive effects.

68. The anti-competitive acts were intentionally directed at the United States market for ecologically minded consumers or consumers focused on fuel mileage or consumption and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for vehicles throughout the United States.

69. The conspiratorial acts and combinations have caused unreasonable restraints in the market for "clean" or ecologically focused vehicles.

70. As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Class who purchased "clean diesel" vehicles have been harmed by being forced to pay inflated, supra-competitive prices for vehicles.

71. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

72. Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for highly efficient fuel mileage and "clean" ecologically focused vehicles has been restrained, suppressed, and/or eliminated in the United States;

(b) Prices for "clean" or ecologically/low fuel consumption vehicles sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels throughout the United States; and

(c) Plaintiffs and members of the Nationwide Class who purchased "defeat" device equipped vehicles indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

73. Plaintiffs and members of the Class have been injured and will continue to be injured in their business and property by suffering from significantly reduced re-sale value, and/or, reduced performance related to fuel consumption, higher engine operating temperatures, increased weight and reduced handling than they would have paid in the absence of such a conspiracy.

74. The alleged contract, combination, or conspiracy is a per se violation of federal antitrust laws.

75. Plaintiffs and members of the Class are entitled to an injunction

27

against Defendants, preventing and restraining the violations alleged
herein.

## SECOND CLAIM FOR RELIEF
### Violation of Michigan Antitrust Statutes

76. Plaintiff incorporates by reference the allegations in the preceding
paragraphs. From as early as 2008, and likely much earlier as related
to testing of cars sold as model year 2009 and later, until the week of
the filing of this Complaint, Defendants and their co-conspirators
engaged in a continuing contract, combination or conspiracy with
respect to the sale of "defeat" device equipped vehicles in
unreasonable restraint of trade and commerce and in violation of the
various state antitrust and other statutes set forth below.

77. The contract, combination, or conspiracy consisted of an agreement
among the Defendants and their co-conspirators to fix, raise, inflate,
stabilize, and/or maintain at artificially supra-competitive prices for
"clean" ecologically friendly/low fuel consumption vehicles and to
allocate customers for such vehicles in the United States.

78. In formulating and effectuating this conspiracy, Defendants and their
coconspirators performed acts in furtherance of the combination and
conspiracy, including:

   a.  Participating in meetings and conversations among themselves

28

in the United States and elsewhere during which they agreed to "defeat" emissions testing requirements at certain levels and advertise vehicles with increased fuel mileage that met certain operating parameters designed to preserve the longevity of the vehicles, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Class with respect ecologically friendly/low fuel consumption vehicles sold in the United States;

b. Participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful "defeat" device.

79. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices with respect to ecologically friendly/high fuel mileage or "clean" vehicles.

80. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, et seq.

a. Defendants' combinations or conspiracies had the following effects: (1) ecologically minded/low fuel consumption/"clean"

29

vehicle price competition was restrained, suppressed, and eliminated throughout Michigan; (2) "clean" vehicle prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for "clean" vehicles that were later found to be equipped with "defeat" devices.

b. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

c. As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, et seq.

81. In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of members of the Plaintiffs and the members of the Class.

82. Accordingly, Plaintiffs and the members of the Class seek damages and costs of suit, including reasonable attorneys fees.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**

83. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

84. As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of "defeat" device equipped vehicles.

85. Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs of the members of the Class for "clean diesel" vehicles equipped with "defeat" devices.

86. Plaintiffs and the members of the Damages Class are entitled to the

31

amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.

87. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

**FOURTH CLAIM FOR RELIEF**
**Federal Lemon Law**
**Magnuson - Moss Act**
**Breach of Express and Implied Warranties**

88. Plaintiff incorporates incorporate by reference the allegations in the preceding paragraphs.

89. Plaintiff asserts this cause of action on behalf of themselves and the other members of the Class.

90. Plaintiff and class members unknowingly purchased "defeat" device software equipped vehicles from Defendants.

91. Defendants made written affirmation of facts related to its "clean diesel" cars related to EPA compliance, and fuel mileage. Because these two operation parameters of a diesel engine form an inverse relationship with each other, the "defeat" device increased emissions to improve fuel mileage. The written statements made to the EPA—upon which Plaintiff

and members of the class relied—constituted a "written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time." This violates Section 2301(6)(a) of the Act.

92. Further, under Section 2301(7) Defendants have violated the "implied warranty" under Michigan State Law related to Michigan Emissions compliance. Plaintiff and other members of the class are unsure whether their continued operation of their vehicles will subject them to criminal and/or civil penalties under state law for non-compliance with emissions regulations.

93. This Court has jurisdiction to decide claims brought under the Magnuson-Moss Act, 15 U.S.C. § 2301.

94. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

95. Volkswagen provided Plaintiff and Class members with "implied

33

warranties," as that term is defined in 15 U.S.C. § 2301(7).

Volkswagen breached these warranties with the "defeat" device.

96. The "defeat" device vehicles are defective.

97. Any attempt by Volkswagen to exclude coverage of the "defeat" device is invalid.

98. Plaintiff and class members are entitled to obtain costs, revoke their acceptance of the "defeat" device equipped vehicles by returning them to Defendant, or otherwise obtain relief as a result of the actions of the Defendants.

## PRAYER FOR RELIEF

Accordingly, Plaintiff respectfully requests that:

A. The Court determine that this action may be maintained as a class action under

Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B. That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a) An unreasonable restraint of trade or commerce in violation of

34

Section 1

of the Sherman Act;

(b) A per se violation of Section 1 of the Sherman Act;

(c) An unlawful combination, trust, agreement, understanding and/or concert

of action in violation of the state antitrust and unfair competition and

consumer protection laws as set forth herein; and

(d) Acts of unjust enrichment by Defendants as set forth herein.

(e) Plaintiffs and the members of the Class recover damages, to the

maximum extent allowed under such laws, and that a joint and

several judgment in favor of Plaintiff and the members of the

Class be entered against Defendants in an amount to be trebled

to the extent such laws permit;

(f) Plaintiff and the members of the Class recover damages, to the

maximum extent allowed by such laws, in the form of

restitution and/or disgorgement of profits unlawfully gained

from them;

(g) Defendants, their affiliates, successors, transferees, assignees

and other officers, directors, partners, agents and employees

thereof, and all other persons acting or claiming to act on their

35

behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

(h) Plaintiffs and the members of the Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

(i) Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

(j) Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

(k) Plaintiffs and members of the Class have such other and further relief as the case may require and the Court may deem just and

proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

Dated: September 24, 2015

/s/ James R. Dunn
James Dunn
Attorney for Plaintiff
Courthouse Square Building
200 SE 6th Street, Suite 402
Fort Lauderdale, FL 33301
Phone: (734) 395-7644
FBN 40950
James@AttorneyJamesDunn.com
(Seeking Admission to the Eastern
District of Michigan)

/s/Aaron D. Cox (P69346)
/s/ Andrew T. Strahan (P69694)
The Law Offices of Aaron D. Cox
Local Co-Counsel for Plaintiff
23380 Goddard Rd.
Taylor, MI 48180
734-287-3664
aaron@aaroncoxlaw.com
andrew@aaroncoxlaw.com